# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SHIRLEY SCOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 08 C 5882 |
| | ) |
| MICHAEL ASTRUE, | ) Magistrate Judge Sidney I. Schenkier |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, the plaintiff, Shirley Scott, pursuant to 42 U.S.C. § 405(g) and

42 U.S.C. § 1383(c), seeks summary reversal and/or remand of a final decision by the Commissioner

of the Social Security Administration ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Commissioner has filed

a cross-motion seeking affirmance of the ALJ's decision denying benefits. For the following

reasons, Ms. Scott's motion for reversal and/or remand is denied (doc. # 37), and the

Commissioner's motion to affirm (doc. # 42) is granted.

## I.

We begin with a summary of the procedural history of this case. On September 14, 2005,

Ms. Scott applied for SSI and DIB, alleging disability beginning October 19, 2001 (R. 20). Her

application was denied initially on January 10, 2006, and upon reconsideration on March 10, 2006

(R. 20). Ms. Scott filed a timely request for a hearing before an Administrative Law Judge ("ALJ")

on May 3, 2006, which was granted (R. 116).

---

[1] On January 7, 2009, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 11, 15).

At the hearing on June 27, 2007, however, ALJ Alfred Burton informed Ms. Scott's attorney, Dan Rosen, that there had been a previous unfavorable decision on Ms. Scott's disability claims, of which Mr. Rosen was unaware (R. 39). Because of a possible conflict between that decision and the October 2001 alleged onset date of Ms. Scott's disability, as well as missing psychiatric records and a pending neurological evaluation, ALJ Burton postponed the hearing (R. 40).

The next hearing took place on January 9, 2008, before ALJ Judith Goodie (R. 48). Ms. Scott, represented by counsel, appeared and testified at the hearing, as did Dr. Ellen Rozenfeld, an impartial medical expert ("ME"), Lee O. Knutson, an impartial vocational expert ("VE"), and Calvin Scott, Ms. Scott's husband. Before the testimony began, Mr. Rosen informed ALJ Goodie that the previous unfavorable decision on Ms. Scott's claims was issued on February 16, 2005 (R. 50). Accordingly, Mr. Rosen amended the alleged onset date of Ms. Scott's disability to February 17, 2005 (id.).

On February 28, 2008, ALJ Goodie (hereinafter, "the ALJ") issued a written decision denying Ms. Scott's application for DIB and SSI benefits, holding that Ms. Scott did not meet her burden of proving that she was disabled under the meaning of the Social Security Act (R. 20-32). On April 16, 2008, Ms. Scott filed her request for review of the ALJ decision (R. 15). On September 4, 2008, the Appeals Council denied Ms. Scott's request for review (R. 1). When the Appeals Council declines to review an ALJ's decision, the ALJ's decision constitutes the final decision of the Commissioner. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). Thereafter, Ms. Scott initiated the present civil action for review of the Commissioner's final decision.

## II.

We now turn to a summary of the administrative record. We set forth general background

2

information and evidence concerning Ms. Scott's subjective medical complaints in Part A and the objective medical evidence in Part B. We then discuss the hearing before the ALJ in Part C, and address the ALJ's written opinion in Part D.

**A.**

Ms. Scott was born on October 10, 1954 (R. 31). She is 5'2", and her weight has fluctuated between approximately 118 and 140 pounds during the relevant time period (*see* R. 374, 277). She completed high school, and then went to vocational school to become a certified nursing assistant (R. 51). After she received her certificate, Ms. Scott was trained at and worked at Brightview Nursing Home from 1987 to 2000 as a dietary aide, activity worker, and social service worker (R. 298). She then worked for Manor Care from 1999 to 2001. Ms. Scott rode the CTA to work because she never received her driver's license (R. 53). Ms. Scott testified that she stopped working in 2001 after she fell down the stairs at her home and injured her lower back and head (R. 51-52). She stated that she could no longer perform her duties at the nursing home, such as picking up the residents, re-positioning them, and transporting them to different activities (R. 52).

At the time of the hearing, Ms. Scott was receiving public aid or general assistance in the amount of $100 per month (R. 52). Ms. Scott is married, but she does not live with her husband (R. 54). She has lived with her daughter and her daughter's fiancé in a three-story townhouse for approximately the last six years (R. 52-53). Ms. Scott testified that she uses the stairs to get to her bedroom on the second floor by holding on to the railing on both sides (R. 53, 63). Ms. Scott helps with the household chores such as cleaning and cooking, and she does her own laundry (R. 53-54). She watches television, reads books and articles, but said that she cannot always finish shows, articles, or books because it is hard for her to concentrate (R. 54).

3

Ms. Scott testified that she cannot work primarily because of her bipolar disorder (R. 55). It is hard for her to concentrate and she sometimes hears voices, even if she takes her medication (R. 55-56). She rides public transportation by herself (R. 54), but she sometimes misses her bus stop because her mind gets "spacey" (R. 65). She was diagnosed with bipolar disorder in June 2006, and she began taking medication for it one week after she began seeing Dr. Tate for therapy (R. 56). The medication makes her sleepy and tearful (R. 56-57). She has to lay down for fifteen to thirty minutes two or three times a day because her medication makes her sleepy (R. 68).

Ms. Scott testified that she also has mood swings; sometimes she will cry, and other times she will be angry (R. 58). However, she testified that the medication helps with these mood swings (*id.*). Ms. Scott first noticed that she felt depressed when she was 18 years old, but it has gotten worse since then (R. 64-65). She does not sleep well at night because she has a lot of nightmares about twice a week, and she has to lay still to go back to sleep (R. 66). She testified that she also has trouble getting along with people because she feels somebody is watching her (R. 68).

In addition to her mental state, Ms. Scott testified that she cannot work because about three times a week her knees and her back give out from under her when she is walking (R. 58). To help with this problem, she walks with her cane or exercises a little, or puts Bengay lotion on her knees (R. 58-59). Ms. Scott said that she can walk at least two blocks without a cane, but she keeps the cane with her just in case her knees give out (R. 61-62). Ms. Scott has been prescribed Fosamax for her bones, but stopped taking it for about a year when she had trouble getting her prescription from Cook County Hospital (R. 57). When she does not take the Fosamax, her legs and knees bother her (R. 58). When she does take the Fosamax, the doctor told her that she has to be upright for about three hours before laying down (R. 58).

4

Furthermore, Ms. Scott testified that her lower back hurts as a result of a fall down the stairs in 2001 (R. 59). Her back starts to hurt when it rains or snows (R. 60), and it hurts when she bends over, mops, or carries a grocery bag (R. 68). Ms. Scott testified that when she experiences sharp pain that lasts for two or three days, Ibuprofen sometimes helps with the pain (R. 59). Ms. Scott said that she can stand for about half an hour before she has to sit down again, and she can sit for about half an hour before she has to get up and walk around (R. 62).

Ms. Scott said she can lift half a gallon of milk, but probably not two gallons of milk because she has little sharp pains up and down both arms (R. 63). She takes Fosamax for her arm pains (*id.*). Ms. Scott testified that her right arm and hand shake two or three days a week for about thirty minutes at a time, making it hard for her to hold things (R. 67).

**B.**

We will review the objective evidence of Ms. Scott's alleged physical and mental impairments separately.

**1.**

On March 26, June 8, and August 3, 2002, Ms. Scott was diagnosed with back pain radiating to her lower extremity, hypertension, and sinus allergy (R. 268-70). On May 12, 2003, and in a follow-up doctor's visit on September 9, 2003, Ms. Scott reiterated complaints of back pain (R. 271). Although she indicated some relief from physical therapy, Ms. Scott stated that the pain prevented her from standing or walking for long periods of time (R. 276). Each time her physical examination was within normal limits (R. 23). The doctor noted non-compliance with her hypertension medications (*id.*). On December 16, 2003, she was 5'2" and 140 pounds and her blood pressure was 170/100; she was placed on an increased dosage of blood pressure medication for uncontrolled

5

hypertension and advised to exercise and continue on a low salt diet (R. 277).

Ms. Scott was treated at the Cook County Hospital emergency room on October 17, 2004, and treated for complaints of low back pain, hypertension, and cough (R. 23). Her blood pressure was 194/99, and an X-ray showed degenerative joint disease of the lumbar spine L4-L5 (*id.*). She was diagnosed with hypertension, arthritis, urinary tract infection, and treated with Enalapril, Ibuprofen, and Cipro (*id.*). Ms. Scott went to Stroger Hospital emergency room the next day for a refill of her blood pressure medication and reported shortness of breath, a mild headache, a history of chronic vision problems, a fall down a flight of stairs two years earlier, and occasional tingling in her shoulder (R. 264-65). She was diagnosed with hypertension and arthritis (*id.*). Two days later, she was treated for occasional dizziness and difficulty sleeping (R. 245-46).

In a visit to the hospital on December 2004, Ms. Scott was diagnosed with hypertension, which was treated with Enalapril and Clonidine; degenerative joint disease, which was treated with Motrin; sinus problems due to allergies; and weight loss (R. 23, 250). At the next doctor's visit on February 17, 2005, the physical exam was unremarkable, but her blood pressure was elevated and she weighed only 118 pounds (*id.*). A CT scan of her chest on March 29, 2005, was negative (*id.*).

On December 12, 2005, Ms. Scott was examined by Dr. Villanueva. He noted her history of osteoporosis, a fall down the stairs, and uncontrolled hypertension (R. 292-94). The physical examination was unremarkable. Ms. Scott said she used a cane for balance, but Dr. Villanueva noted that she was able to walk fifty feet normally without using a cane (*id.*). She had full range of motion in her lower spine, and her musculoskeletal and neurological examinations were within normal limits (*id.*).

On June 15, 2006, Ms. Scott was examined at Roseland Community Hospital. She was again

6

diagnosed with uncontrolled hypertension and elevated blood pressure (R. 320-26). Ms. Scott did not have chest pain or swollen legs, and she stated that she exercised by walking daily (*id.*). She was prescribed high blood pressure medications, Lopressor and Vasotec (*id.*). In July 2006, Ms. Scott was seen at Stroger Hospital emergency room for a medication refill (R. 346-47). Her physical exam was within normal limits (*id.*)

The Chicago Department of Public Health records indicated that Ms. Scott was treated June 2006 through May 2007 for hypertension, back and knee pain, hand tremors, and cough (R. 348-52). She continued on Lopressor, and also was prescribed Tylenol (*id.*). In an examination on May 23, 2007, Ms. Scott complained of upper back pain but denied any pain upon pushing, pulling, or lifting (R. 367). Ms. Scott was diagnosed with cough, hypertension, and a hand tremor, which was more noticeable at rest (R. 367, 371). Ms. Scott was prescribed Divan, Albuterol, Lovastatin, Hetz, Lopressor, and referred for a neurological consultation (*id.*).

Progress notes from the Chicago Department of Public Health from August 15, 2007, through November 7, 2007, indicate that Ms. Scott continued to be treated for hypertension, low back pain, and depression (R. 25). During this time period, Ms. Scott's cough disappeared, and her breathing and hand tremor were improved (R. 25). She continued to complain of back and leg pain (*id.*). In August 2007, Ms. Scott complained of pain with leg raise, but had no back or knee pain with a leg raise test in November 2007 (*id.*).

On January 23, 2008, an X-ray of Ms. Scott's lower spine showed minimal degenerative joint disease and no fracture, and an X-ray of her knees was negative (R. 410-12).

**2.**

As for her alleged mental impairments, Ms. Scott was diagnosed with depression and anxiety

on October 23, 2001, and she was prescribed Prozac (R. 242). On December 22, 2005, Dr. Robert Prescott, a consulting psychologist, examined Ms. Scott (R. 297). At that examination, Ms. Scott reported an irregular heart beat, problems with her balance, some visual problems, a head injury, and a history of back injury (R. 297-300). She carried a cane but did not use it, and her gait was unsteady (R. 297). Ms. Scott reported feeling depressed every two years, with the depression lasting one and a half years or more (R. 299). She also reported crying and irritability, but she denied any suicidal ideation (*id.*). Ms. Scott reported getting along well with her daughter but not with coworkers; she has only one friend, whom she rarely sees (*id.*). Ms. Scott's speech was clear and relevant. She said that she used to hear a lot of voices, but that occurred less frequently (R. 301). Ms. Scott's memory was poor, but her immediate memory appeared intact (*id.*). Dr. Prescott diagnosed mild to moderate major depression and a cognitive disorder, probably related to a prior head injury (*id.*).

Dr. Tyrone Hollerauer, a DDS reviewing consultant, completed an advisory Psychiatric Review Technique form on January 8, 2006, based on a review of Ms. Scott's medical file (R. 302). Dr. Hollerauer opined that Ms. Scott has depression; unspecified secondary to general medical conditions; mild restrictions in her activities of daily living ("ADLs"); no limitations in social functioning; and mild limitations in maintaining concentration, persistence or pace, with no episodes of decompensation (R. 305, 312). He opined that Ms. Scott's impairment does not meet or medically equal Listing 12.02 or 12.04 (*id.*). On February 8, 2006, Dr. Joseph Cools, another consultant who reviewed Ms. Scott's file, agreed with Dr. Hollerauer's assessment (R. 316).

On April 27, 2006, Ms. Scott was evaluated at the Chicago Department of Public Health at the request of her attorney (R. 385). The examiner reported that she was oriented to person, time and place, and that there was no evidence of thought disorder (R. 390). During the examination, Ms.

8

Scott's speech was coherent and logical, her sight and judgment were intact, and she denied suicidal or homicidal ideation (*id.*). She had difficulty recalling dates (*id.*). Ms. Scott was diagnosed with possible major depression with a Global Assessment of Functioning ("GAF") score of 65 (R. 392).

Ms. Scott was evaluated on June 29, 2006, by psychiatrist Candice Tate (R. 372). In this first meeting with Dr. Tate, Ms. Scott was diagnosed with bipolar disorder (but not panic disorder), depressive episode with psychosis, and a GAF of 45 (R. 379). Dr. Tate opined that Ms. Scott had a history of chronic mental illness (*id.*). Dr. Tate prescribed multiple psychotropic medications including Zoloft, Abilify, and Cogentin (R. 374-76).

Thereafter, Dr. Tate continued to provide Ms. Scott with regular psychiatric counseling (R. 378-84). She continued feeling better overall in July 2006, but still felt hopeless and tearful at times with mild mood swings (R. 381). On August 24, 2006, Ms. Scott's sleep had improved, and her hand shaking was improved with Cogentin, but she was still distrustful of others and cried every weekend (R. 380). In October 2006, Ms. Scott felt somewhat depressed and tearful, but had a good appetite and energy. In February 2007, she was still tearful and reported hand tremors, but her sleep, appetite, and energy were good. On May 3, 2007, she had good energy and fair concentration, but she still cried and had non-persistent paranoid feelings as well as hand tremors (R. 384).

On July 26, 2007, Dr. Tate completed a Mental Impairment Questionnaire (R. 393-400). She diagnosed Ms. Scott with bipolar disorder, depressive episode with psychosis, and a GAF of 49 (R. 393). The GAF of 49 was listed as the highest GAF of the past year (*id.*). Dr. Tate noted poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, delusions or hallucinations, recurrent panic attacks, psychomotor agitation, paranoia, feelings of worthlessness, difficulty concentrating, perceptual disturbances, social withdrawal,

9

illogical thinking, decreased energy, generalized persistent anxiety, hostility and irritability and pathological passivity, and daily crying spells (R. 394). Dr. Tate also found that Ms. Scott had a restricted affect, slow speech, impaired thought processes, and she was initially guarded and eventually tearful (*id.*). Dr. Tate prescribed Abilify, Zoloft, and Cogentin, and noted that Ms. Scott suffers medication side effects including increased weight and decreased energy (R. 395). Dr. Tate wrote that Ms. Scott's condition improves with medication and therapy, and she opined that Ms. Scott's prognosis was guarded to fair (*id.*).

Dr. Tate opined that Ms. Scott would likely be absent from work more than three times a month, and that she had good ability to interact with the public and maintain socially appropriate behavior; fair ability to perform simple tasks, remember and carry out short, simple instructions, work in coordination with co-workers, and maintain punctual and regular attendance; and poor ability to understand, remember, and carry out detailed instructions, handle work stress, perform at a consistent pace, complete normal workdays/weeks, and maintain attention and concentration (R. 397-98). Dr. Tate further opined that Ms. Scott has slight restrictions in ADLs, marked difficulties in social functioning, frequent deficiencies of concentration, persistence or pace, and has experienced three or more episodes of decompensation of extended duration (R. 399).

Dr. Tate continued to treat Ms. Scott for bipolar disorder and depression with psychosis from July 26, 2007, through November 8, 2007 (R. 407-09). On November 8, 2007, Ms. Scott reported mood swings, but she was sleeping and eating well and had improved energy (*id.*). From January 1, 2007, through December 31, 2007, Ms. Scott was prescribed multiple medications including Hydrochlorothiazide, Benztropine, Enalapril, Metoprolol, Lovastatin, Albuterol, Seraline, Abilify, Divan, and Aspirin (R. 26).

10

**C.**

At the January 9, 2008, hearing, the ALJ heard testimony from Ms. Scott, her husband, Dr. Rozenfeld (the ME), and Mr. Knutson (the VE). As Ms. Scott's testimony is discussed above in the section discussing her subjective medical complaints, we begin our review here with her husband's testimony at the hearing.

**1.**

Ms. Scott's husband, Calvin Scott, testified that they were married for thirty-three years, but they have been separated for ten years (R. 70). He does not live with Ms. Scott because he takes care of his mother, but he spends three nights a week with his wife, and they see each other every day (*id.*). Mr. Scott checks on her and worries about their grandchildren because of her dreams, fearfulness, and paranoia (*id.*).

Mr. Scott does not think Ms. Scott could work because she does not comprehend things, her mind wanders off, and she forgets things (R. 71). In addition, she drops things, and her knees are bad (*id.*). Mr. Scott testified that if someone says something negative to Ms. Scott, she may get upset or scared and start to cry (*id.*).

**2.**

Dr. Rozenfeld reviewed the documentation of Ms. Scott's alleged mental impairments. Dr. Rozenfeld compared Ms. Scott's mental diagnoses in December 2005, April 2006, and June 2006. Dr. Rozenfeld noted that although similar issues were described in all three mental status examinations, in December 2005 and April 2006, Ms. Scott had mild to major depression and a GAF of 65; in June 2006, however, Ms. Scott's GAF dropped to 45, and she was diagnosed with bipolar disorder (R. 72-75).

Dr. Rozenfeld questioned the bipolar diagnosis because the record did not indicate that Ms. Scott had any manic episodes, but only depressed symptoms, such as insomnia, crying spells, and diminished concentration (R. 75-76). Rather, Dr. Rozenfeld opined that the diagnosis of mild to moderate major depression made at the first evaluation of mental functioning was appropriate because Ms. Scott was prescribed Prozac but had no psychiatric hospitalizations or outpatient treatment and no limitations in her ADLs (R. 76-77). In addition, Dr. Rozenfeld opined that Ms. Scott does not have "full blown paranoia"because her concentration problems, mood swings, and hallucinations at times seemed to diminish, and the hallucinations occurred only at night (R. 74). At that point, Ms. Scott interrupted Dr. Rozenfeld's testimony to state that the hallucinations occurred during the day one week prior to the hearing (R. 75).

Dr. Rozenfeld then evaluated the severity of Ms. Scott's alleged mental impairments under the Social Security Administration listings, and found that Ms. Scott's impairments do not meet or equal any listing (R. 77). Under the paragraph A criteria, which set forth the medical findings, Dr. Rozenfeld found that Ms. Scott met the following conditions under Listing 12.04: antadonia, sleep disturbance, difficulty concentrating, and hallucinations (*id.*). Under the paragraph B criteria, the adjudicator rates the claimant's limitations and restrictions in ADLs; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Schmidt v. Astrue*, 496 F.3d 833, 844-45 (7th Cir. 2007). Under those criteria, Dr. Rozenfeld found mild limitations as to Ms. Scott's ADLs, and moderate limitations with regard to her social functioning and concentration, persistence, and pace, with no episodes of decompensation (R. 78).

Furthermore, Dr. Rozenfeld opined that Ms. Scott would be markedly limited in terms of detailed complex tasks but not significantly limited in terms of understanding and carrying out very

12

short, simple instructions (R. 78). Dr. Rozenfeld described Ms. Scott as moderately limited in maintaining attention and concentration for extended periods of time even for simple, routine tasks (*id.*). However, she opined that Ms. Scott would be able to sustain an ordinary routine without special supervision for simple, routine tasks, and that Ms. Scott could handle a two-hour work segment adequately (R. 79-80). Dr. Rozenfeld further opined that Ms. Scott has moderate limitations in her ability to deal with the general public and co-workers and possibly also supervisors, and thus would fare best in an environment that had only limited, brief, and occasional contact with others (R. 79). Ms. Scott would not do well with a strict production quota or fast paced requirement (*id.*). Dr. Rozenfeld did not believe that Ms. Scott would be absent from work three times a month (*id.*).

Lastly, Dr. Rozenfeld opined that the increase in Ms. Scott's dosage of Zoloft and Abilify did not indicate a worsening in Ms. Scott's mental condition, but an attempt by her doctors to achieve the appropriate level of medication (R. 80-81).

### 3.

The VE, Mr. Knutson, described Ms. Scott's work history as a certified nursing assistant, a social service assistant, and a psycho-social assistant (R. 82). He explained that these jobs are semi-skilled and medium according to the Dictionary of Occupational Titles ("DOT") and as she performed them (*id.*).

The ALJ asked the VE two hypothetical questions (R. 1678-80). The ALJ first asked the VE to assume a fifty year old person with the same educational background and work experience as Ms. Scott, with the functional capacity to: lift and carry ten pounds frequently and twenty pounds occasionally; sit for six hours out of an eight hour day; stand and walk for six hours in an eight hour day; push and pull ten pounds frequently and twenty pounds occasionally; occasionally climb stairs

13

and ramps; perform simple, routine, repetitive tasks; have occasional interaction with co-workers, supervisors, and the general public; and have occasional changes in work routine and work setting (R. 82-83). The hypothetical individual would avoid concentrated exposure to hazardous machinery, unprotected heights, and work that is performed at a production rate pace (*id.*). The VE testified that this person would not be able to perform any of her past work due to the physical and mental demands (R. 83). The VE opined that there are approximately 18,000 light jobs as a hotel cleaner or maid and approximately 4,000 jobs as a parking lot attendant that the individual could perform (R. 83-84).

Next, the ALJ modified the hypothetical to include a functional limitation of a sit/stand option (R. 84). The VE explained that few light jobs allow a sit/stand option except approximately half of the parking lot attendant jobs, leaving 2,000 jobs that the individual could perform (R. 84). These jobs require the employee to be focused at least eighty-five to ninety percent of the time, but Mr. Knutson opined that an employee who was absent ten percent of the time would be terminated (R. 85-87). A parking lot attendant would have to be alert and watchful (R. 89).

## D.

In her written opinion issued on February 28, 2008, the ALJ applied the sequential five-step analysis and found Ms. Scott not disabled (R. 32). First, the ALJ found that Ms. Scott met the insured status requirements of the Social Security Act through December 31, 2006, and that Ms. Scott has not engaged in substantial gainful activity since her alleged onset date (R. 22).

In Step 2, the ALJ found that Ms. Scott had the following severe impairments: mild to moderate major depressive disorder, uncontrolled hypertension, osteoporosis, lower back pain, and minimal degenerative joint disease of the lumbar spine (R. 22). The ALJ found that Ms. Scott also

14

has non-severe right hand tremors (*id.*).

At Step 3, the ALJ found that Ms. Scott does not have a mental impairment that meets or medically equals any of the listed impairments (R. 26). The ALJ agreed with Dr. Rozenfeld's conclusion that Ms. Scott does not have bipolar disorder given that there was no evidence of manic episodes during a year of treatment (R. 26). The ALJ also agreed with Dr. Rozenfeld that the appropriate diagnosis was major depression, but that the treatment notes indicated that Ms. Scott has responded well to treatment and medication, with improved sleep, concentration, and energy, fewer auditory and visual hallucinations, and less crying (*id.*). The ALJ gave little weight to Ms. Scott's testimony that she heard voices during the day because there was no evidence of that in the treatment records (*id.*), and Ms. Scott stated at the hearing that her day time hallucinations had first occurred only within the prior week (R. 75). The ALJ determined that the medical evidence did not support Dr. Tate's opinion that Ms. Scott would be absent from work more than three times a month (R. 30).

The ALJ adopted Dr. Rozenfeld's findings that: Ms. Scott's mental impairment does not meet or medically equal any listing; the A criteria are antadonia, sleep disturbance, difficulty concentrating, hallucinations, and paranoid thinking; the B criteria include mild limitations in ADLs, moderate limitations in maintaining social functioning, concentration, persistence and pace, with no episodes of decompensation documented in the record; there is no evidence of the presence of C criteria; Ms. Scott is markedly limited for performing detailed tasks, and not significantly limited for understanding, remembering, and carrying out short simple instructions; she has moderate limitations in maintaining attention and concentration for extended periods and for interacting with the general public, co-workers, and supervisors; she is able to sustain an ordinary routine without special supervision, and able to cope with stress for simple tasks, but should not be required to

15

adhere to production quotas; she can handle two-hour work segments for routine tasks adequately; and Ms. Scott was getting to a healthy level of medication (R. 27). Based on these findings, the ALJ determined that the paragraph B criteria were not satisfied because Ms. Scott's mental impairments did not cause two marked limitations or one marked limitation and repeated episodes of decompensation (R. 27). As for Ms. Scott's physical impairments, the ALJ determined that Ms. Scott's hypertension does not meet or equal any Listing because it has not resulted in any end organ damage (R. 28).

The ALJ then determined that Ms. Scott has the residual functional capacity ("RFC"):

to perform light work and could lift and carry 20 pounds occasionally and 10 pounds frequently. She could stand and walk 6 hours and sit 6 hours in an 8-hour workday. She could occasionally climb stairs, ramps. She must avoid concentrated exposure to hazards including machinery and unprotected heights. She has non-exertional limitations that limit her to simple routine repetitive tasks, occasional changes in work routine and setting, no production rate pace, occasional interaction with coworkers, supervisors and the general public. She may be off task 10% of the time.

(R. 28). In determining Ms. Scott's RFC, the ALJ found that Ms. Scott's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Ms. Scott's statements concerning the intensity, persistence, and limiting effects of her physical and mental limitations were not entirely credible (R. 29-30). The ALJ also questioned the intensity of Ms. Scott's back and knee pain because she lives on the second floor of a three-story townhouse and uses the stairs (R. 29). In addition, although Ms. Scott stated that her knees give out two to three times a week, an X-ray of her knees was negative and showed no swelling or pain on examination (id.). Moreover, there was no objective evidence that she fell down stairs several years ago, and X-rays of her lumbar spine showed minimal degenerative joint disease (id.). Further, although Ms. Scott testified that she buys her medications at a CVS pharmacy and takes a bus to her appointments with

16

Dr. Tate, she also stated that she temporarily stopped buying Fosamax in 2006 because she could not get to Cook County Hospital to pick up her medication (*id.*). In addition, Ms. Scott's right arm tremors have not been assessed by studies, and psychiatry notes indicated that the shaking improved somewhat with medication (*id.*).

The ALJ also did not fully credit Ms. Scott's testimony that she cannot concentrate or perform detailed work because she hears voices, since she testified she heard voices in the daytime only once (R. 29). The ALJ also questioned Ms. Scott's allegations of poor memory because she knew the location of her CVS pharmacy. Further, psychiatric notes in 2007 showed Ms. Scott's mental status examination was within normal limits, she was sleeping fine, and the changes in her medication were effective (*id.*). The ALJ did not fully credit Ms. Scott's claim that she does not relate well socially, because she occupies her days partly with talking on the phone (*id.*).

The ALJ gave little weight to the DDS consultant's opinion that Ms. Scott's impairment is non-severe, because that was contrary to the medical evidence (R. 30). The ALJ relied on Dr. Villanueva's report of an essentially unremarkable physical examination in December 2005, which was consistent with physical examinations from 2004 and 2007, which revealed no pain or swelling in Ms. Scott's legs (*id.*). In addition, X-rays showed only minimal disease of her lower spine and normal knees, despite her complaints of knee and back pain with leg raise (*id.*).

In Step 4, the ALJ determined that Ms. Scott was unable to perform her past physical work as a certified nurse's assistant, social service assistant and psycho/social assistant because those jobs were semi-skilled and in the range of light to medium exertion, according to the VE (R. 31). In Step 5, the ALJ determined that considering Ms. Scott's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Ms. Scott can perform (R. 31).

17

At the hearing, the VE testified that given Ms. Scott's age, education, work experience, and RFC, she would be able to perform the requirements of representative occupations in the Chicago metropolitan area as a hotel cleaner (18,000 jobs) (*id.*). Therefore, the ALJ determined that a finding of "not disabled" was appropriate (R. 32).

## III.

We begin our review of the Commissioner's determination with the governing legal standards. To establish a disability under the Social Security Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Furthermore, a claimant must show not only that her impairments prevent her from doing her previous work, but also that her impairments prevent her from performing any other "kind of substantial gainful work" that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A).

The social security regulations outline a five-step evaluation process for determining whether a claimant has a disability. 20 C.F.R. § 404.1520(a)(4). These steps, which must be evaluated sequentially, require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) any impairment listed in the appendix to the regulations as severe enough to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20

18

C.F.R. § 404.1520(a)(4).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. 20 C.F.R. § 404.1520(a)(4). A negative finding at any step other than Step 3 precludes a finding of disability. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The claimant has the burden of proof at every step except Step 5, where it shifts to the Commissioner. *Fischer v. Barnhart*, 309 F. Supp. 2d 1055, 1059 (N.D. Ill. 2004). If the claimant has a severe impairment that does not satisfy a listing at Step 3, the ALJ must determine the claimant's RFC to perform past relevant work. 20 C.F.R. § 404.1520(e). The RFC is used in Step 4 to determine whether the claimant can perform her past relevant work and in Step 5 to determine if the claimant can adjust to other work. 20 C.F.R. §§ 1520(f)-(g). If a claimant's RFC allows her to perform jobs that exist in significant numbers in the national economy, then the Commissioner will determine that the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1).

In reviewing the ALJ's decision, the Court may not decide facts anew, reweigh evidence, or substitute its own judgment for that of the ALJ. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Where supported by substantial evidence, the Court must accept the ALJ's findings of fact. 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673. The substantial evidence standard requires that the ALJ's findings be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* If conflicting evidence would allow reasonable minds to differ, the responsibility to determine disability belongs to the Commissioner – and the ALJ, by extension – not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Clifford v. Apfel*, 227 F.3d 863, (7th Cir. 2000) (holding that the ALJ, not the courts, resolves evidentiary conflicts). When substantial evidence exists to support the ALJ's decision, it should be affirmed.

*Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004).

That said, an ALJ is not entitled to unlimited judicial deference. An ALJ must "build an accurate and logical bridge from the evidence to [his or] her conclusion," *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), and "must confront the evidence that does not support his [or her] conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir., 2004). The ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). In addition, the ALJ must articulate the reasons he or she rejected certain evidence so that the reviewing court can ultimately assess whether the determination was supported by substantial evidence. *Id.* at 677-78; *see also Craft*, 539 F.3d at 673.

Ms. Scott contends that the ALJ's determination that she is not disabled should be reversed because: the ALJ's finding that Ms. Scott was not entirely credible was erroneous, the ALJ should not have given greater weight to the ME's testimony than to the treating psychiatrist's testimony, the ALJ's RFC determination was erroneous, and the ALJ failed to address VE testimony that was favorable to Ms. Scott (doc. # 38, Pl.'s Mem. at 1). We address each of those arguments in turn.

A.

Ms. Scott contends that the ALJ incorrectly found Ms. Scott's testimony as to her physical or mental limitations not entirely credible.[2] The ALJ "must consider the claimant's level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R. § 404.1529(c), and must justify the

---

[2] The Seventh Circuit has recently commented that the phrase "not *entirely* credible," is "meaningless boilerplate" that "yields no clue to what weight the trier of fact gave the testimony." *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) (emphasis in original). That is surely true when the ALJ stops there, and says no more. In this case, however, the phrase "not entirely credible" was not used in a vacuum but supported in the ALJ's opinion, which, as shown in the discussion below, analyzed Ms. Scott's testimony in comparison to other medical evidence in the record.

20

credibility finding with specific reasons supported by the record." *Id.* The ALJ may not merely ignore the testimony or rely solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding. *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005). If an ALJ finds that a claimant lacks credibility, he may disregard – or discount – a claimant's assertions. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). We afford an ALJ's credibility finding "considerable deference" and will overturn it only if "patently wrong." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (internal quotations omitted).

Here, a review of the record shows that the ALJ was not "patently wrong." Contrary to Ms. Scott's contentions, the ALJ discussed Ms. Scott's diagnosis of osteoporosis and her prescription for Fosamax, as well as the complaints of back pain radiating to her legs that she reported to her doctors. After reviewing all the evidence, the ALJ determined that Ms. Scott's ability to walk without a cane, her negative back X-ray, and her consistent use of stairs contradicted her subjective complaints of back pain. In addition, the ALJ noted that Ms. Scott's ADLs were not significantly restricted by her alleged pain. The ALJ thus followed the requirements for evaluating the credibility of a claimant's subjective complaints. As in *Schmidt*, Ms. Scott's "contentions to the contrary are nothing more than a rehash of the medical records that do not point to any specific evidence contradicting the ALJ's conclusions." *Schmidt*, 395 F.3d at 747. Thus, the ALJ's credibility determination as to Ms. Scott's testimony as to her physical limitations is "not patently wrong, is supported by substantial evidence, and is sufficiently detailed that we are able to trace its path of reasoning." *Id.*

Next, Ms. Scott contends that the ALJ erroneously found her testimony about hearing voices during the day not credible (Pl.'s Mem. at 9). The ALJ relied on the fact that none of the

21

documentary evidence – including notes of Ms. Scott's complaints to the medical professionals – referred to hearing voices during the day. There was only one reference to hearing voices during the day in the record. During Dr. Rozenfeld's testimony as to Ms. Scott's hearing voices at night, Ms. Scott interjected that she heard voices in the daytime the previous week (R. 75). In response, Dr. Rozenfeld asked "was this the first time you heard it during the day?", to which Ms. Scott responded "yeah" (*id.*). Thus, the ALJ's determination that Ms. Scott's testimony that she hears voices during the day lacks credibility is supported by substantial evidence.

Ms. Scott next claims that her knowledge of the location of a CVS pharmacy was not a sufficient basis for discrediting her memory or concentration problems, when the medical professionals agreed that Ms. Scott has definite limitations in these areas (Pl.'s Mem. at 10). We agree that this reason alone is insufficient to call into question Ms. Scott's memory and concentration problems. However, the ALJ provided additional reasons for failing to credit fully Ms. Scott's claims of lack of concentration and memory. For example, in April 2006, the mental health examiner noted that, even though Ms. Scott had difficulty recalling dates, she was oriented to person, time, and place, had coherent and logical speech, and intact judgment, with a GAF of 65. Thus, the ALJ's credibility determination here is also supported by substantial evidence and sufficiently detailed to allow the Court to trace the path of her reasoning.

Ms. Scott also disputes the ALJ's failure to fully credit her testimony about her right hand tremors (Pl.'s Mem. at 10). The ALJ, however, did credit her testimony on this matter. Based on her testimony and the medical evidence, the ALJ found that the hand tremors were not severe. The ALJ did not base this conclusion solely on the fact that the tremors were not treated as a separate ailment; rather, the ALJ relied on other evidence in the record that showed that the alleged hand

22

tremors were not disabling, including Ms. Scott's testimony that she regularly cooked, cleaned, and did her own laundry. Moreover, Ms. Scott's psychiatrist noted that the tremors improved with the psychiatric medication she was prescribed. Thus, the ALJ's credibility determination here is also supported by substantial evidence.

**B.**

Ms. Scott also contends that the ALJ did not adequately support her decision to give greater weight to the opinion of Dr. Rozenfeld, the non-examining medical expert, than to Dr. Tate, Ms. Scott's treating psychiatrist since June 29, 2006 (Pl.'s Mem. at 11-12). Dr. Rozenfeld testified that Ms. Scott had mild limitations in ADLs, moderate limitations maintaining social function; moderate limitations maintaining concentration, persistence and pace; and no episodes of decompensation. This contrasted to Dr. Tate, who found Ms. Scott had slight restrictions in ADLs, marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence, or pace; and repeated episodes of deterioration (R. 25, 399).

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing 20 C.F.R. § 404.1527). However, "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. At that point, the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh . . ." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (internal citations and quotations omitted).

Here, the ALJ found that the Dr. Tate's opinion was inconsistent with other substantial

23

evidence in the record, specifically the two prior mental health examinations of Ms. Scott. Only two months before Dr. Tate began treating Ms. Scott, a mental examination had found Ms. Scott's mental impairments to be much less serious than Dr. Tate did. Dr. Rozenfeld analyzed the difference between the two earlier mental examinations of Ms. Scott and Dr. Tate's later evaluation, and found the earlier mental examinations to be more consistent with the objective and subjective evidence of Ms. Scott's impairments. The ALJ agreed with Dr. Rozenfeld, and provided ample citations to the record in support of this decision.

Ms. Scott responds that Dr. Tate's opinions were consistent with the record as a whole, demonstrating that Ms. Scott had good days – where she felt better – and bad days, where she felt depressed and hopeless (Pl.'s Mem. at 14). In *Bauer*, the Seventh Circuit held that the ALJ improperly discounted the treating doctors' diagnosis of bipolar disorder in the claimant in part because one of the treating doctors made hopeful remarks, indicating that at various meetings the claimant "had a brighter affect and increased energy" or "was doing quite well." *Bauer*, 532 F.3d at 609. The Seventh Circuit explained that a person who has a chronic disease and is under continuous treatment with heavy drugs is likely to have better and worse days, but such a person could not hold down a full-time job because half the days – the worse days – the claimant could not work. *Id.* In Ms. Scott's case, by contrast, neither the ALJ nor Dr. Rozenfeld discounted Dr. Tate's opinions because she opined that Ms. Scott had some better days; rather, they found that the record as a whole did not support Dr. Tate's diagnosis of bipolar disorder because there was no evidence of any manic episodes, only depressive episodes. As the Seventh Circuit explained, bipolar disorder is characterized by "violent mood swings, the extremes of which are mania – a state of high excitement in which [the claimant] loses contact with reality and exhibits bizarre behavior – and

24

clinical depression, in which [the claimant] has great difficulty sleeping or concentrating, has suicidal thoughts and may actually attempt suicide." *Bauer*, 532 F.3d at 607. The ALJ and Dr. Rozenfeld found the record was devoid of evidence of this disorder.

The ALJ's decision to rely on Dr. Rozenfeld's opinion was supported by substantial evidence.

## C.

Ms. Scott next argues that the ALJ's physical RFC finding was not supported by the record. The ALJ determined that Ms. Scott has the RFC to perform light work; lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, or sit six hours in an eight-hour workday; and occasionally climb stairs and ramps. The RFC is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675-76. In making the RFC determination, the ALJ must look at the medical evidence and other evidence in the record, such as the claimant's testimony at the administrative hearing. *Id.* at 676. The ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered "severe." *Id.*

Ms. Scott claims the ALJ's findings were inconsistent with the physical RFC assessment of a state agency doctor (Pl.'s Mem. at 15-16). As explained above, however, the ALJ relied on the opinions of DDS consultants, Drs. Villanueva and Prescott. In a separate sentence in her opinion, the ALJ stated that she did not rely on a "DDS consultant's opinion that claimant's impairment is non-severe" because it was contrary to the medical evidence (R. 30). This sentence, however, likely describes the DDS psychiatric consultation, not the physical RFC assessments. (*See* R. 302 (mental health DDS assessment finding that Ms. Scott's mental health impairments are not severe)).

That said, the ALJ properly assessed Ms. Scott's physical RFC based on the record as a

25

whole. *See Schmidt v. Apfel*, 496 F.3d 833, 845 (7th Cir. 2007) (in determining a claimant's RFC, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians"). The ALJ relied on Dr. Villanueva's opinion, who noted that Ms. Scott had no difficulty getting on and off the examination table, could walk normally without a cane, had full range of motion in the lumbosacral spine, and normal musculoskeletal and neurological exams. In addition, the ALJ noted that those findings were consistent with the 2007 X-rays which showed only minimal degenerative joint disease of the lumbosacral spine and negative bilateral knees despite Ms. Scott's complaints of knee and back pain. Thus, the ALJ reasonably concluded that Ms. Scott could perform light work with non-exertional mental limitations.

Ms. Scott next argues that the ALJ improperly ignored her testimony that she must alternate between sitting and standing every thirty minutes, that her knees go out two to three times per week, and that she can not walk more than two blocks without a cane, all of which Ms. Scott claims would have led to a finding that she could only perform sedentary work (Pl.'s Mem. at 16-17). As explained above, the ALJ did analyze Ms. Scott's testimony; however, the ALJ determined that Ms. Scott's complaints and stated limitations were not entirely credible because her medical examinations and X-rays were normal (R. 17, 29). In *Knox v. Astrue*, as here, the ALJ acknowledged the claimant's description of her back pain and limitations, but found that the medical evidence suggested she had exaggerated her limitations. *Knox v. Astrue*, No. 08-3389, 2009 WL 1747901, at *3 (7th Cir. June 19, 2009).

In addition, Ms. Scott argues that the ALJ did not provide reasons for the specific limitations in Ms. Scott's physical RFC and failed to discuss how Ms. Scott's hand tremors impaired her ability to work (Pl.'s Mem. at 16-17). In the context of the entire opinion, this argument is unpersuasive.

"The ALJ is not required to mention every piece of evidence but must provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled, so that as a reviewing court, we may assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Craft*, 539 F.3d at 673 (internal quotations omitted). The ALJ's opinion satisfies this articulation requirement.

Contrary to Ms. Scott's arguments, the ALJ addressed her subjective complaints of knee and back pain and limited Ms. Scott's exertional level to light work accordingly because there was only minimal degenerative joint disease and her knee problems were non-severe. In addition, the ALJ determined that Ms. Scott's hand tremors were adequately controlled with medication. It is sufficient that the ALJ pointed to the objective medical evidence in the record, including the medical reports that determined that Ms. Scott's impairments were non-severe, to build the "accurate and logical bridge" to the ALJ's findings. *See Craft*, 539 F.3d at 673. As the ALJ's determination of Ms. Scott's RFC is supported by substantial evidence, this Court declines to reverse or remand the ALJ's determination of Ms. Scott's RFC. *Flener*, 361 F.3d at 447.

## D.

Lastly, Ms. Scott argues that the ALJ failed to address the VE testimony favorable to her, specifically, the VE's response to the ALJ's second hypothetical, which added a sit/stand option (Pl.'s Mem. at 17-18). The first hypothetical assumed a claimant who could perform the full range of light work, "able to stand or walk, off and on, for a total of approximately 6 hours of an 8-hour workday, lift up to 20 pounds, and frequently lift or carry objects weighing up to 10 pounds." *Zatz v. Astrue*, 08-4175, 2009 WL 3198743, at *4 (7th Cir. Oct. 5, 2009) (citing 20 C.F.R. § 416.967; SSR 83-10). The VE opined that there were 18,000 hotel maid jobs and approximately 4,000 jobs

as a parking lot attendant for that hypothetical individual. For the second hypothetical, however, the VE opined that a sit/stand option would only leave approximately 2,000 garage attendant jobs available. The ALJ did not discuss the second hypothetical in her opinion, finding instead that Ms. Scott had the RFC of the first hypothetical individual.

The government argues that the second hypothetical incorporated a limitation that was not supported by the medical evidence, and thus, the ALJ was not required to address it. We agree. An ALJ "is not required to mention every piece of evidence," *Craft*, 539 F.3d at 673; certainly, this means that an ALJ is not required to mention VE testimony rendered irrelevant from the RFC the ALJ adopts.[3] Moreover, even if the failure to consider the sit/stand option was an error, it would be harmless because the VE testified that even a sit/stand option would allow Ms. Scott to perform jobs that exist in significant numbers in the national economy. *See Coleman v. Astrue*, No. 07-1729, 2008 WL 695045, at *5 (7th Cir. Mar. 14, 2008) (holding that error was harmless where significant number of jobs remained available to claimant); *see also Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (finding that as few as 1,400 jobs constitutes a significant number in the national economy).

---

[3] Ms. Scott further argues that the ALJ's determination was erroneous because the she did not discuss the impact that missing three days of month per work would have on jobs that Ms. Scott could perform (Pl.'s Mem. at 18-19). However, the ALJ rejected Dr. Tate's opinion that Ms. Scott would miss that much work, and after considering the evidence in the record, the ALJ adopted Dr. Rozenfeld's opinion that there was no basis to conclude that Ms. Scott would be absent three times per month.

28

## CONCLUSION

For the foregoing reasons, we deny Ms. Scott's motion for reversal and/or remand (doc. # 37), and we grant the Commissioner's motion to affirm (doc. # 42). The case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: April 22, 2010**